2004 ND 174

**NODAK MUTUAL INSURANCE COMPANY, Plaintiff and Appellee**

v.

Corey **WAMSLEY**, Jeff Wamsley, Joe Wamsley, Craig Wamsley, Kimberly Kinev and Jamie Pfau, Defendants and Appellants.

No. 20030374.

Supreme Court of North Dakota.

Sept. 13, 2004.

Duane H. Ilvedson (argued) and Telly Jerome Meier (on brief), Nilles, Ilvedson, Stroup, Plambeck & Selbo, Ltd., Fargo, N.D., for plaintiff and appellee.

Anne G. Biby (argued), Hash & O'Brien, Kalispell, MT, and Gerald A. Kuhn, Law Office of Gerald A. Kuhn, PC, Napoleon, N.D., for defendants and appellants.

KAPSNER, Justice.

[¶ 1] Corey Wamsley, Jeff Wamsley, Joe Wamsley, Craig Wamsley, Kimberly Kinev, and Jamie Pfau ("Wamsley heirs") appealed from a declaratory judgment entered in an action brought by Nodak Mutual Insurance Company ("Nodak") to determine Nodak's obligations under insurance policies. We conclude the district court properly ruled this case is governed by North Dakota law and we affirm.

## I

[¶ 2] While riding in their Chrysler in Montana, Alan and Sharon Wamsley, the Wamsley heirs' parents, were involved in a collision when a vehicle operated by Lester Stanton crossed the median and struck the Wamsleys' vehicle, which was then struck by a motor home. Stanton and the Wamsleys were killed in the collision. Stanton's insurer paid its policy limits of $25,000 per person to the Wamsleys' estate.

[¶ 3] At the time of the accident in Montana, the Wamsleys owned three vehicles and each was insured by a policy issued by Nodak: a Chrysler (policy number AU–217749), an Oldsmobile (policy PAND 000318684), and a Dodge pickup (policy number PAND 000405922). Each policy provided underinsured motorist coverage ("UIM") of $100,000 per person, per accident. Nodak paid $200,000 to the co-personal representatives of the Estate of Alan and Sharon Wamsley under the Chrysler policy and secured a partial release of UIM claims.

[¶ 4] On May 22, 2003, Nodak's attorney, Duane Ilvedson, recommended Nodak "bring a Declaratory Judgment action in North Dakota" and "took over further handling of the file." Between June 4 and June 18, 2003, Nodak served a summons and complaint dated June 4, 2003, upon each of the Wamsley heirs for a judgment declaring, among other things, "that the underinsured motorist coverages of Policy No. PAND 000318684 and Policy No. PAND 000405922 do not apply to the August 8, 2002, accident and cannot be stacked." The Wamsley heirs sued Stanton's estate and Nodak in Montana district court on June 23, 2003. On June 25, 2003, Nodak filed in North Dakota district court the summonses and complaints it had served on the Wamsley heirs.

[¶ 5] On July 9, 2003, the Wamsley heirs filed a motion to dismiss for forum non conveniens and for failure to state a claim upon which relief may be granted. The Wamsley heirs' attorney, Anne Biby, supported the motion with her affidavit and documentary exhibits averring, among other things: (1) in a December 19, 2002, letter to Kirk Holmes of Nodak, Biby requested payment of $200,000 for UIM coverage on one of the Wamsley policies, while reserving the "right to assert a 'stacking' claim for underinsured coverage amounts for the other two vehicles as well," advising that a case involving the issue of stacking UIM coverage was pending before the Montana Supreme Court, and making a settlement offer; (2) on April 18, 2003, the Montana Supreme Court struck down Montana's anti-stack-

ing statute, Biby sent Nodak a copy of the decision, and Biby demanded "the entire $600,000.00 in underinsured motorist coverage for the three Wamsley vehicles insured with NoDak," (3) in a telephone conversation on May 20, 2003, Holmes assured Biby that Nodak "was looking into the matter;" (4) Nodak filed this action, which "it concealed [] from this law firm until after it had served the Wamsley heirs;" and (5) on June 23, 2003, Biby's "law firm filed a Complaint in Montana against the tortfeasor's estate and against Nodak Mutual." In their brief in support of the motion to dismiss, the Wamsley heirs asserted Montana law should be applied. Nodak responded that the matter is governed by North Dakota law, and that North Dakota law and the policies' provisions prohibit stacking. The trial court denied the Wamsley heirs' motion to dismiss, noting "[t]he only real issue is whether Nodak will be required to provide additional coverage" and finding "North Dakota has more significant cont[]acts and interest in the issue presented in this case."

[¶ 6] Nodak moved for summary judgment, which the trial court granted, stating it had already determined North Dakota law applied, the defendants conceded "North Dakota law does not allow stacking of underinsured motorist coverage," and concluding "that Nodak Mutual is not obligated to pay stacked underinsured motorist benefits." Judgment was entered providing that the UIM coverages of the policies on the Wamsley vehicles not involved in the accident "do not apply to the August 8, 2002 accident and cannot be stacked," and the maximum amount of UIM coverage for the deaths of Alan and Sharon Wamsley was the $100,000 for each already paid by Nodak under the policy on the Wamsley vehicle involved in the accident. The Wamsley heirs appeal-

ed, contending that Montana law should apply in the resolution of this litigation.

II

[¶ 7] While it might be argued this appeal is premature, we do not agree. Section 32–23–06, N.D.C.C., provides:

"The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding. However, the court shall render or enter a declaratory judgment or decree in an action brought by or against an insurance company to determine liability of the insurance company to the insured to defend, or duty to defend, although the insured's liability for the loss may not have been determined."

Under the first sentence of N.D.C.C. § 32–23–06, "the trial court's decision to grant or deny a request for a declaratory judgment is discretionary. The trial court's decision will not be set aside unless the court has abused its discretion." *Blackburn, Nickels & Smith, Inc. v. National Farmers Union Prop. & Cas. Co.*, 452 N.W.2d 319, 322 (N.D.1990). The second sentence, however, requires the trial court to render a declaratory judgment to determine coverage and duty to defend. *Id.* at 323. A declaratory judgment in such a case must be issued even though there has not been a judgment determining the insured's liability, *id.* at 323, thus resulting in the prospect of piecemeal litigation. Here, Nodak is not seeking to determine if it has any responsibility to defend or if the policies cover underinsured motorists, and the second sentence of N.D.C.C. § 32–23–06 is, therefore, inapplicable. We are unable to conclude that the trial court abused its discretion under the first sentence of N.D.C.C. § 32–23–06. *Midwest Med. Ins.*

*Co. v. Doe,* 1999 ND 17, ¶ 7, 589 N.W.2d 581, where we concluded an insurer's request for declaratory relief was premature and inappropriate, does not require a similar conclusion here. That case involved a conceded duty to defend and unresolved factual issues bearing on the issue of indemnity. Here, the underlying tort issues do not affect the insurance issue, and there are no unresolved fact issues precluding resolution of the legal question about whether the policies involved can be stacked.

### III

[¶ 8] We have recently addressed our review in an appeal from a summary judgment:

> Summary judgment is a procedural device for promptly disposing of a lawsuit without a trial if there are no genuine issues of material fact or inferences which can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Tarnavsky v. McKenzie County Grazing Ass'n,* 2003 ND 117, ¶ 7, 665 N.W.2d 18. "Whether summary judgment was properly granted is 'a question of law which we review de novo on the entire record.'" *Iglehart v. Iglehart,* 2003 ND 154, ¶ 9, 670 N.W.2d 343 (quoting *Wahl v. Country Mut. Ins. Co.,* 2002 ND 42, ¶ 6, 640 N.W.2d 689). On appeal, this Court decides if the information available to the trial court precluded the existence of a genuine issue of material fact and entitled the moving party to summary judgment as a matter of law. *Keator v. Gale,* 1997 ND 46, ¶ 7, 561 N.W.2d 286.

*Zuger v. State,* 2004 ND 16, ¶ 7, 673 N.W.2d 615.

### IV

[¶ 9] This case presents a choice-of-law issue. Under North Dakota law, coverages under the policies may not be stacked. Under Montana law as declared by the Montana Supreme Court, the coverages may be stacked. "When an accident occurs in a state other than that in which the policy was issued, the difficulty in determining the right to stack uninsured/underinsured motorist benefits escalates considerably." 12 Lee R. Russ and Thomas F. Segalla, *Couch on Insurance 3d* § 169:22, at 169–51 (1998). "The trend in resolving choice of law issues is to apply the law of the state with the most significant relationship to the dispute." 4 Eric Mills Holmes, *Holmes' Appleman on Insurance 2d* § 21.11, at 325 (1998).

[¶ 10] "'In general, it is fitting that the state whose interests are most deeply affected should have its local law applied.'" *Apollo Sprinkler Co. v. Fire Sprinkler Suppliers & Design, Inc.,* 382 N.W.2d 386, 390 (N.D.1986) (quoting *Restatement (Second) of Conflict of Laws* § 6, comment f (1971)). However, not all issues arising out of a given claim need to be decided by the same state's law. 4 Holmes, *supra,* § 21.2, at 231. "[D]ifferent states' law may be applied to different aspects of the controversy." *Id.* § 21.1, at 226. Thus, the determination of which state's law should be applied in a case may depend on what issue is being considered. *See, e.g., Great West Cas. Co. v. Hovaldt,* 1999 SD 150, ¶ 8, 603 N.W.2d 198 ("To determine which state's law to apply, we consider the nature of the action. This suit sounds in contract. Policy coverage, not tort liability, is the question."). *See also Vigen Constr. Co. v. Millers Nat'l Ins. Co.,* 436 N.W.2d 254, 257 (N.D.1989) (noting importance of contacts significant to the underlying construction contract "is greatly diminished when the question is whether to apply North Dakota law to a liability insurance contract which might be available to cover" losses arising out of the

construction involved). With regard to the nature of the action involved here, the dissent inappropriately melds tort and contract issues. Availability of stacking is a contract issue for purposes of conflict of laws analysis. 12 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 169:22, at 169–52 (1998).

[¶ 11] In *Issendorf v. Olson,* 194 N.W.2d 750, 756 (N.D.1972), this Court abandoned the lex loci delicti (law of the place where the wrong occurred) doctrine and adopted the significant contacts approach in resolving choice of law questions in tort cases. The court recognized the premise articulated by the New York Court of Appeals:

> Justice, fairness and the "best practical result" (*Swift & Co. v. Bankers Trust Co.,* 280 N.Y. 135, 141, 19 N.E.2d 992, 995, supra) may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation.

*Issendorf,* 194 N.W.2d at 754 (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963)). The court quoted with approval the choice-influencing considerations of predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law enunciated in Robert A. Leflar, *Choice–Influencing Considerations in Conflicts Law,* 41 N.Y.U.L.Rev. 267, 282 (1966). *Issendorf,* at 755.

[¶ 12] This Court applied the significant contacts approach in *Apollo Sprinkler Co.,* 382 N.W.2d at 389, a contracts case, because both parties agreed that approach was appropriate. In *Plante v. Columbia Paints,* 494 N.W.2d 140, 141 (N.D.1992), which was a declaratory judgment action brought to determine the coverage provided by an insurance policy for injuries occurring in an explosion in North Dakota, this Court held "[t]he significant contacts approach is ... appropriate in contract cases with multistate factual contacts." The court noted that "[t]he relative importance" of Leflar's five choice-influencing considerations " 'varies according to the area of the law involved.' " *Id.* (quoting Robert A. Leflar, *Choice–Influencing Considerations in Conflicts Law,* 41 N.Y.U.L.Rev. 267, 282 (1966)). The court noted: "North Dakota's contacts are primarily related to the underlying tort claims. The contacts related to the insurance contract between Hartford and Columbia are primarily Washington contacts. '[T]he most significant contacts are those bearing upon the contractual relationship.' " *Plante,* 494 N.W.2d at 142 (quoting *Apollo Sprinkler Co.,* 382 N.W.2d at 390).

[¶ 13] In deciding what law to apply in a case presenting multistate contacts, our significant contacts test for deciding choice-of-law questions requires a two-pronged analysis. *Daley v. American States Preferred Ins. Co.,* 1998 ND 225, ¶ 10, 587 N.W.2d 159. "Initially, we determine all of the relevant contacts which might logically influence the decision of which law to apply." *Id.* at ¶ 12. Secondly, we apply Leflar's choice-influencing considerations "to determine which jurisdiction has the more significant interest with the issues in the case." *Id.*

[¶ 14] The Wamsley heirs point to the following Montana contacts: (1) the accident occurred in Montana; (2) the parties in two of the three vehicles involved in the collision were Montanans; (3) Montana authorities responded to the accident; (4) all witnesses were Montanans; (5) medical

bills were incurred in Montana; (6) a Montana laboratory determined the tortfeasor's blood alcohol content; and (7) a tort action is proceeding in Montana. We note that the contacts the Wamsley heirs rely on are significant to the underlying tort action, but are less significant to the insurance contract claim.

[¶ 15] Nodak relies on the following North Dakota contacts: (1) Alan and Sharon Wamsley were North Dakota residents; (2) Nodak is a North Dakota company issuing only North Dakota policies and does not issue automobile insurance policies in Montana; (3) the three polices issued by Nodak covered three North Dakota vehicles and were negotiated and issued in North Dakota; (4) the Wamsleys applied for the policies in North Dakota through North Dakota insurance agents, and the applications were signed, processed, accepted and delivered in North Dakota; (5) the Wamsleys paid the premiums in North Dakota, added or deleted vehicles in North Dakota, and changed or renewed coverage in North Dakota; (6) the policies contain forms and endorsements approved by the North Dakota Insurance Commissioner; (7) four of the Wamsleys' children live in North Dakota; (8) Corey Wamsley and Jeff Wamsley, both North Dakotans, have been appointed co-personal representatives of the estates of Alan and Sharon Wamsley in North Dakota.

[¶ 16] Having determined the contacts which might influence the decision of which state's law to apply, we next apply Leflar's choice-influencing considerations to determine which state has the more significant interest in the issues involved in this case.

### A. Predictability of results

"Predictability of results includes the ideal that parties to a consensual transaction should be able to know at the time they enter upon it that it will produce, by way of legal consequences, the same socioeconomic consequences ... regardless of where the litigation occurs[.]" Leflar, *American Conflicts Law,* § 103, at 290. Simply stated, the objective of the predictability factor is to fulfill the parties' justified expectations. *Daley,* 1998 ND 225, ¶ 24, 587 N.W.2d 159. In insurance contract cases, we have said this consideration favors application of the law of the state in which the insurance policy was negotiated, issued, and the premiums paid. *Id.* at ¶ 26; *Vigen Constr. Co.,* 436 N.W.2d at 257; *Apollo Sprinkler Co.,* 382 N.W.2d at 390.

[¶ 17] In considering the predictability of results, the *Plante* court said:

" 'Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions.' " *Apollo,* supra, at 390, quoting *Restatement (Second) of Conflict of Laws* § 6, comment i (1971) [hereinafter *Restatement* ]. A liability insurance contract is a transaction to which parties are likely to give advance thought. "[P]arties to a consensual transaction ... should be able to plan their transaction as one with predictable results." R. Leflar, 41 N.Y.U.L.Rev. 267, 283 (1966). Ideally, the "parties to a consensual transaction should be able to know at the time they enter upon it that it will produce, by way of legal consequences, the same socioeconomic consequences ... regardless of where litigation occurs so that forum-shopping will benefit neither party." Leflar et al., *American Conflicts Law, supra,* § 103, p. 290. The purpose of protecting parties' justified expectations ought to be served "even when the parties do not think about choice of law." *Id.* "Since there is usually no fixed place for per-

formance of insurance policies, the law of the place of making has more often been taken as determinative of rights under them than with other types of contracts." *Id.,* § 153 pp. 433–434. . . . We conclude Hartford and Columbia are more likely to have thought that the coverage provided would be determined in accordance with the law of Washington, where the contract was negotiated, the policy was delivered, and the premiums were paid, than in accordance with the law of any other state.

*Plante,* 494 N.W.2d at 142–43. *See also* 4 Eric Mills Holmes, *Appleman on Insurance 2d* § 21.11 at 330–31 (1998):

> In the automobile liability situation, the law of the state where the policy was negotiated, the premiums were paid, and the insurer and the insured resided provided more significant contacts than the mere occurrence of the accident in another state. . . . Generally speaking, the site of the accident is not a sufficient contact to require the application of that state's law in the absence of other interests or contacts.

[¶ 18] The insurance policies involved here provide that if the insured is involved in an accident somewhere other than where the covered auto is principally garaged, and that state or province requires a nonresident to maintain insurance when using a vehicle there, the policy will provide either "at least the required minimum amounts and types of coverage" or "the minimum amounts and types of other coverages required for nonresidents." Such a provision is enforceable against an insurer. *California Cas. Indem. Exch. v. Deardorff,* 157 Cal.App.3d 548, 203 Cal. Rptr. 725, 727 (1984). However, Montana does not require underinsured motorist coverage.

[¶ 19] It has been said that an insurance company doing business in several states knows an automobile it insures will be driven from state to state, and accepts the risk that the insured may be subject to liability not only in the state where the policy is written, but in other states as well. *National Farmers Union Prop. & Cas. Co. v. Nodak Mut. Ins. Co.,* 528 F.Supp. 1093, 1096 (D.N.D.1981). Nevertheless, we continue to believe that an insurer and an insured are more likely to believe that the law of the state in which a policy was applied for, negotiated, paid for, and issued will be applied than the law of another state. *E.g., Daley,* 1998 ND 225, ¶ 26, 587 N.W.2d 159; *Plante,* 494 N.W.2d at 143; *Vigen Constr. Co.,* 436 N.W.2d at 257; *Apollo Sprinkler Co.,* 382 N.W.2d at 390. This consideration favors application of North Dakota law.

### B. Maintenance of interstate and international order

[¶ 20] Choice-of-law rules should further harmonious relations between states, facilitate commerce between states, and avoid interstate friction. *Apollo Sprinkler Co.,* 382 N.W.2d at 390. Application of our state's law would not "manifest disrespect" for Montana's sovereignty. *Daley,* 1998 ND 225, ¶ 27, 587 N.W.2d 159. Nor should application of our law cause interstate friction. *Id.* at ¶ 29. "We find that maintenance of interstate order does not require application of [Montana] law." *Id.* This consideration favors the application of neither state's law.

### C. Simplification of the judicial task

[¶ 21] " 'It will usually be easier for the forum court to apply its own law than any other.' " *Plante,* 494 N.W.2d at 143 (quoting Robert A. Leflar, et al., *American Conflicts Law* § 105, at 294 (4th ed.1986)). However, "[s]implification of the judicial task is not a relevant factor in this case because the . . . law of either state could be applied without difficulty." *Daley,* 1998

ND 225, ¶ 30, 587 N.W.2d 159. Courts in either state will have the same tasks to perform. This consideration favors the application of neither state's law.

### D. Advancement of the forum's governmental interests

A state's governmental interest in a choice-of-law case is discoverable by (a) identifying the factual contacts which the litigated transaction had with that state, then (b) determining whether those contacts give rise to real reasons (socioeconomic or political justifications) for applying the state's law to litigated issues in the case.

*Daley*, 1998 ND 225, ¶ 31, 587 N.W.2d 159 (quoting Robert A. Leflar, et al., *American Conflicts Law* § 106, at 295 (4th ed.1986)). We have said that North Dakota can have no substantial governmental interest in regulating the relationship between out-of-state insurance companies and their out-of-state insureds. *See Plante*, 494 N.W.2d at 143; *Apollo Sprinkler Co.*, 382 N.W.2d at 391. We have the same concern here with applying Montana law. "In this case, North Dakota, not [Montana], has the substantial governmental interest in regulating the relationship between" a North Dakota insurer and its North Dakota insureds. *Daley*, at ¶ 33. "The fortuitous location of the accident in [Montana] does not change that, absent some other contact with the state." *Id.* If Montana law did not offer the prospect of a greater recovery than North Dakota law, we doubt that the heirs of North Dakota insureds would be seeking the application of Montana law. *Compare Jepson v. General Cas. Co. of Wisconsin*, 513 N.W.2d 467, 471 (Minn.1994) ("If the law of North Dakota promised Jepson a greater recovery than Minnesota, we doubt very much that he would be litigating this coverage dispute in our courts."). Certainly, Montana has governmental interests in promoting travel and commerce in Montana, in securing a source of funds for the payment of an insured's creditors, and in seeking to make sure that insureds injured by underinsured motorists recover all of their damages to the extent possible. Montana's interest is not so strong that it has mandated UIM coverage, however. *See Stutzman v. Safeco Ins. Co. of America*, 284 Mont. 372, 945 P.2d 32, 37 (1997) ("there is no statutory mandate for underinsured motorist coverage in Montana"). North Dakota, on the other hand, requires that an "insurer shall also provide underinsured motorist coverage," N.D.C.C. § 26.1–40–15.3, but does not allow the limit of liability for underinsured motorist coverage to be stacked upon limits of coverage for other motor vehicles, N.D.C.C. § 26.1–40–15.4. Thus, North Dakota has more clearly than Montana articulated its interest in underinsured motorist coverage by mandating such coverage, and has clearly articulated a limit to such coverage by prohibiting stacking of coverages. "Because all contacts other than the location of the accident occurred in North Dakota, we find that North Dakota's governmental interests are advanced by application of North Dakota law." *Daley*, at ¶ 33. This consideration favors application of North Dakota law.

### E. Application of the better rule of law

[¶ 22] "The final consideration is whether North Dakota or [Montana] has, in an objective sense, the better rule of law." *Daley*, 1998 ND 225, ¶ 34, 587 N.W.2d 159. "As the Minnesota Supreme Court has stated, however, '[s]ometimes different laws are neither better nor worse in an objective way, just different.'" *Id.* (quoting *Jepson v. General Cas. Co.*, 513 N.W.2d at 473). We need not decide if either Montana or North Dakota has a better rule of law, as the Wamsley heirs

have said this factor "cannot be said to have influence here."

[¶ 23] After considering the relevant state contacts in light of Leflar's choice-influencing considerations, we conclude North Dakota has the more significant contacts and interest with regard to the issues of insurance coverage.

V

[¶ 24] The judgment is affirmed.

[¶ 25] GERALD W. VANDE WALLE, C.J., JAMES M. BEKKEN, D.J., and WILLIAM A. NEUMANN, JJ., concur.

[¶ 26] The Honorable JAMES M. BEKKEN, D.J., sitting in place of SANDSTROM, J., disqualified.

MARING, Justice, dissenting.

[¶ 27] I respectfully dissent. First, I am of the opinion that this declaratory judgment action is premature and, second, that, even if it is not premature, the Leflar choice-of-law factors have not been appropriately applied.

[¶ 28] In *Midwest Med. Ins. Co. v. Doe*, 1999 ND 17, 589 N.W.2d 581, a physician's medical malpractice insurer brought a declaratory judgment action, requesting a declaration that it had no duty to indemnify Dr. Roe for damages that he may become obligated to pay for negligent mishandling of patient transference. Our Court held it was improper for the trial court to grant declaratory relief and vacated the summary judgment. *Id.* at ¶ 13. The medical malpractice insurer admitted it had an obligation to indemnify Dr. Roe for any damages that he may become obligated to pay the patient, Doe, upon her claims the doctor negligently prescribed medications and negligently failed to refer her to a psychiatrist. *Id.* at ¶ 6. The only obligation of the medical malpractice insurer at issue was its obligation to indemnify Dr. Roe for liability arising out of his sexual relationship with Doe. *Id.* We concluded that there were unresolved factual issues and that the insurer had conceded the duty to defend and potential obligation to indemnify. *Id.* at ¶ 12.

[¶ 29] In the present case, Nodak concedes it has an obligation to pay underinsured motorist coverage to the Estate of Alan and Sharon Wamsley. The issue is not whether there is underinsured motorist coverage or whether there is a duty to defend. The only issue is whether the underinsured motorist coverage can be stacked. It is the amount of underinsured motorist coverage available that is at issue. The copersonal representatives of the Estate of Alan and Sharon Wamsley have brought an action in Montana against the other deceased driver's estate and Nodak for damages exceeding $50,000 and for underinsured motorist coverage under all three of their policies with Nodak. Resolution of this declaratory judgment action will not settle the rights, status, and other legal relations in that underlying action. The issue of the amount of damages, the resolution of which triggers underinsured motorist coverage, will not be eliminated in the underlying litigation by our resolution of this declaratory judgment action. Further, underinsured motorist coverage is first-party coverage and there is no duty to defend against a third-party action like there is when liability coverage is at issue.

[¶ 30] Finally, by deciding the declaratory judgment action, we encourage piecemeal litigation. An insured, who is injured in an automobile accident, should be able to bring one action against both the tortfeasor and the insurer with whom he has underinsured motorist coverage. In North Dakota, the underinsured motorist insurer has the right to intervene in the tort action. *See Fetch v. Quam*, 530 N.W.2d 337 (N.D.1995). This allows the

insurer to protect itself on the issue of liability and damages arising under the provisions of the insurance policy. In Montana, the plaintiff may bring an action against both the tortfeasor and the underinsured motorist insurance carrier in the same action. *State ex rel. Gadbaw v. Mont. 8th Judicial Dist. Ct.*, 316 Mont. 25, 75 P.3d 1238. In the present case, the co-representatives of the Estate of Alan and Sharon Wamsley brought the tort action in Montana where the deceased defendant had resided and where the accident occurred and also named Nodak as a defendant. In the interests of justice, to avoid multiplicity of litigation, to conserve judicial time, and to avoid "the harassment of the insured by the necessity to litigate his rights twice," both the tort action and insurance claim should be heard together. *Fetch*, at 338 (quoting *Heisner v. Jones*, 184 Neb. 602, 169 N.W.2d 606, 611–12 (1969)). Our Court pointed out that "[g]enerally, courts favor intervention and joinder of all parties in one action as a convenient method of settling all related controversies on the same subject." *Fetch*, at 338 (citation omitted).

[¶ 31] Therefore, I am of the belief that the majority opinion is an advisory opinion and that the summary declaratory judgment should be vacated.

[¶ 32] In *Daley v. American States Preferred Ins. Co.*, 1998 ND 225, 587 N.W.2d 159, our Court affirmed our use of Leflar's choice-influencing considerations when deciding a choice-of-laws issue. The majority opinion in the present case recognizes that this is the appropriate analysis. However, the majority opinion then proceeds to apply the Leflar considerations to the significant contacts in a manner that suggests an application of either the *lex loci* doctrine, which our Court abandoned in *Issendorf v. Olson*, 194 N.W.2d 750, 756 (N.D.1972), or a "strong territorial ap-

proach," which we clarified in *Daley*, at ¶¶ 18–19.

[¶ 33] We specifically adopted the significant contacts test and the Leflar choice-influencing factors for application in contract cases. *See Plante v. Columbia Paints*, 494 N.W.2d 140 (N.D.1992). Importantly, we said, "A court's obligation is to be true to the method rather than to seek merely factual analogies between cases and import wholesale the choice of law analysis contained in those cases." *Daley*, 1998 ND 225, ¶ 21, 587 N.W.2d 159.

[¶ 34] I have no argument with the list of contacts in the majority opinion. I do, however, believe that the majority has failed to appropriately determine the significance of those contacts upon application of Leflar's five choice-influencing factors and, thus, has failed to correctly determine which state has the more significant interest in the issues raised.

[¶ 35] Although our Court has applied the Leflar choice-of-law factors to questions involving commercial liability insurance and subrogation between insurers, it has never before applied the Leflar choice-of-law factors to a question arising under an uninsured motorist/underinsured motorist provision in an automobile policy. *See Plante*, 494 N.W.2d 140; *Apollo Sprinkler Co., Inc. v. Fire Sprinkler Suppliers & Design, Inc.*, 382 N.W.2d 386 (N.D. 1986); and *Daley*, 1998 ND 225, 587 N.W.2d 159.

[¶ 36] In concluding that North Dakota law is favored under this factor, the majority opinion relies exclusively on where the contract was negotiated, the policy delivered, and the premiums paid. If this mechanical approach is applied in every contract case, the outcome is predictable in most automobile policy disputes. I do not believe that these contacts are intended to be the exclusive determining contacts in all contract cases. The majority fails to con-

sider other relevant contacts and state interests which favor the application of Montana law in this case.

[¶ 37] The majority opinion fails to recognize non-contract contacts, such as the nature of the insurance contract, the location medical bills were incurred, and the strong public policy of Montana protecting financially those injured within its borders in its application of the Leflar choice-of-law considerations and fails to give them proper weight. Under the majority opinion's analysis, you do not need judges applying the Leflar factors to significant contacts in contract cases. All you need for a choice-of-law decision is to know where the parties entered into the automobile policy, where the premiums are paid, and where the vehicle is principally garaged. Our Court has never applied the "significant contacts" test and Leflar choice-of-law factors in that manner. Instead, it is our Court's responsibility to consider not only the contract contacts, but the place of injury, the place of medical treatment, the foreseeability of the presence of the insured in another state, the adhesory and portable nature of automobile insurance contracts, the interests of the state where the accident occurred, and the purpose and policies underlying that state's law. *See Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408 (1973); *Hime v. State Farm Fire & Cas. Co.,* 284 N.W.2d 829 (Minn. 1979); *Hague v. Allstate Ins. Co.,* 289 N.W.2d 43 (Minn.1978), *aff'd on reh'g; Abramson v. Aetna Cas. & Sur. Co.,* 76 F.3d 304 (9th Cir.1996).

[¶ 38] I, therefore, respectfully dissent.